**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| VIRGINIA P. DALE, | ) | Case No. 04-40152-JWV |
| | ) | |
| Debtor. | ) | |
| | ) | |
| VIRGINIA P. DALE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 04-4046-JWV |
| | ) | |
| HOMEQ SERVICING CORP., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

On February 24, 2004, the Debtor, Virginia P. Dale, acting *pro se*, filed a complaint against her mortgagee, HomEq Servicing Corp. ("HomEq"), and, apparently, every person associated with HomEq with whom she had ever had contact, including individuals working at HomEq and attorneys working for HomEq in default and foreclosure proceedings against Ms. Dale (collectively, "Defendants").[1] Ms. Dale alleged fifteen different causes of action in her adversary complaint, including civil conspiracy, negligence, reckless or negligent misrepresentation of material facts, defamation, breach of contract, fraud, intentional infliction of emotional distress, unjust enrichment, tortious interference with contractual relations, Racketeering Influenced and Corrupt Organizations Act ("RICO") claims, and violations of the Fair Debt Collection Practices Act ("FDCPA"), Real Estate Protection Act ("RESPA"), Fair Credit Reporting Act ("FCRA"), Truth in Lending Act ("TILA"), and Federal Trade Commission Act ("FTCA").

---

[1] One defendant, the law firm of Kozeny & McCubbin, which assisted HomEq in one of its foreclosure attempts, did not file an answer in these proceedings. On January 3, 2005, Ms. Dale filed a motion for default judgment against Kozeny & McCubbin, to which it responded that default judgment should not be entered against Kozeny & McCubbin because Ms. Dale failed to properly serve the complaint on it in accordance with Fed. R. Bank. P. 7004. Although it appears that service was, indeed, improper, the Court does not need to reach that issue because, as discussed herein, judgment against all of the defendants, including Kozeny & McCubbin, will be denied on the merits.

1

Due to the gravity and number of allegations leveled against the Defendants and the likely need for extensive and expensive pre-trial discovery, and in consideration of Ms. Dale's financial condition and the fact that she was acting *pro se*, the Court accepted HomEq's suggestion to conduct a bifurcated proceeding along the following lines:

1. Defendants would initially forego discovery of Ms. Dale and her proposed experts and witnesses and would respond to Ms. Dale's requests for production of documents (pending as of December 10, 2004).

2. Upon the conclusion of Ms. Dale's discovery, the court would hear Ms. Dale's evidence and argument.

3. At the close of Ms. Dale's case-in-chief, the Defendants would move the Court for judgment on partial findings pursuant to Fed. R. Bank. P. 7052 (Fed. R. Civ. P. 52).

4. If any of Ms. Dale's claims survived Defendants' motions, Defendants could then take discovery from Ms. Dale and her proposed experts and witnesses on the surviving issues.

5. Upon completion of Defendants' discovery, the parties would reconvene for trial on Ms. Dale's remaining claims, if any.

This procedure was explained to Ms. Dale in writing and in open court, and she agreed to it without reservation.

Accordingly, on January 7, 2005, the Court conducted the trial on Ms. Dale's case-in-chief. Ms. Dale called two witnesses and was also allowed to provide her own narrative testimony in support of her case. At the close of Ms. Dale's presentation of evidence and argument, the Defendants orally moved for judgment as a matter of law. They filed written motions pursuant to Fed. R. Bank. P. 7052 (Fed. R. Civ. P. 52) immediately after the hearing. Ms. Dale filed a written objection to the motions.

Upon review of the evidence submitted, parties' arguments, and relevant law, the Court is now prepared to rule.

## I. STANDARD OF REVIEW

Judgment pursuant to Rule 52 is appropriate when a party has been fully heard on an issue, and the court can make a proper disposition of the party's claims on the evidence presented.[2]  Rule 52(c) states:

> "[I]f during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule."

Fed. R. Civ. P. 52(c).

When considering motions pursuant to Rule 52, courts need not give any favorable inferences to the plaintiff and judgment is proper for the defendant if it believes the plaintiff has failed to make a case.[3]  If a court grants judgment pursuant to Rule 52, the court must issue findings of fact and conclusions of law supporting its decision.[4]

In this case, the Court finds that the Defendants are entitled to judgment as a matter of law under Rule 52 on all counts of Ms. Dale's complaint, and the following constitutes the Court's findings of fact and conclusions of law as required by Rule 52(c).

## II. JURISDICTION

In addition to her prayer for monetary damages, Ms. Dale seeks the equitable cancellation of HomEq's mortgage. That relief, if granted, would greatly affect the administration of the estate and implicates the validity, extent, and priority of HomEq's lien. Therefore, the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157(b)(2)(A) and (K).  Venue is proper in this court pursuant to 28 U.S.C. § 1409.

---

[2] 9A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure, § 2573.1, Judgment on Partial Findings (1995); *see, e.g.*, *Harvey v. Wal-Mart Stores, Inc.*, 33 F.3d 969, 970 (8th Cir. 1994).

[3] *See Madison v. Frank*, 966 F.2d 344 (8th Cir. 1992); 9A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2573.1, at 496-97 (1995).

[4] Fed. R. Civ. P. 52(a); *In re Fordu*, 201 F.3d 693 (6th Cir. 1999).

### III. BACKGROUND

Despite the plethora of legal and factual allegations in Ms. Dale's second amended complaint,[5] the trial on this matter revealed that the facts underlying Ms. Dale's complaint are straightforward and unremarkable.

On November 24, 1998, Ms. Dale obtained a loan from The Money Store ("TMS") in the principal amount of $34,083.00, at 9.750% interest. The loan was secured by a mortgage on Ms. Dale's residence. Just over a year later, on December 14, 1999, Ms. Dale filed for protection under chapter 7 of the bankruptcy code (Case No. 99-44856) and obtained a discharge of her debts, including the debt owed to TMS. From that point forward, Ms. Dale was no longer personally liable on her loan to TMS, but since TMS's mortgage survived bankruptcy, Ms. Dale was required to make payments on the loan or face the loss of her home.

On July 18, 2000, Ms. Dale filed for protection under chapter 13 of the Bankruptcy Code (Case No. 00-42619) for the first time. That case was dismissed for Ms. Dale's failure to make plan payments. On June 11, 2001, Ms. Dale filed another chapter 13 bankruptcy (Case No. 01-42749), which was also dismissed for her failure to make plan payments. Notably, however, in the course of her second chapter 13 bankruptcy, Ms. Dale entered into a stipulation with TMS in which Ms. Dale expressly agreed that she owed TMS the principal amount of $33,865.82 plus $7,565.66 in arrearage, for a total debt of $41,431.48.[6]

On November 7, 2000, TMS notified Ms. Dale that Fairbanks Capital Corp., ("Fairbanks" or "HomEq") was the new servicer of her loan, and Fairbanks followed that letter up with a similar notice less than 30 days later, on December 5, 2000.

On December 9, 2002, HomEq sent Ms. Dale a letter notifying her that her account was under review for foreclosure. That notice provided an itemized accounting

---

[5] Ms. Dale's original complaint alleged various improper acts committed by the Defendants dating back to September 1997, but pursuant to the Court's (Koger, J) dismissal of a similar complaint filed by Ms. Dale in a previous bankruptcy (Case No. 00-42619, Adversary Proceeding No. 00-4158), and this Court's application of *res judicata* to that dismissal (set forth in detail in the Court's September 22, 2004 Memorandum Order), Ms. Dale's second amended complaint was limited to allegations relating to events occurring after November 6, 2000.

[6] Although facts related to Ms. Dale's previous bankruptcies were not introduced at trial, the Court may, *sua sponte*, take judicial notice of its own files and records. *See Annis v. First State Bank of Joplin* 96 B.R. 917 (Bankr. W.D. Mo 1987).

4

of the total amount necessary to cure the default on her loan ($19,429.23). Apparently, Ms. Dale could not afford the $19,429.23, so in an attempt to avoid foreclosure, Ms. Dale contacted the Kansas City Housing Information Center ("HIC"), an organization providing temporary assistance to people facing housing crises, where she was assisted by P.J. Phelps ("Phelps"), a case manager.

Phelps did not waste any time taking up Ms. Dale's cause and immediately went "straight to the top," sending a letter on December 19, 2002, to Ken Thompson, the President and CEO of Wachovia Corp. (the parent corporation to HomEq), to request an accommodation on behalf of Ms. Dale. Thompson heeded Phelps' and Ms. Dale's pleas and apparently directed HomEq to "take care of the problem." HomEq responded to Ken Thompson's directive by sending Ms. Dale a loan modification offer on January 22, 2003. The modified loan proposed by HomEq was for $42,194.85 at 8% interest and monthly payments of $321.78. To accept the modification, all Ms. Dale had to do was pay a $578 loan modification fee and return a signed copy of the modification agreement.

Apparently unable to afford the loan modification fee and the first payment under the modified loan (in spite of not having made any payments on the loan for some time), Ms. Dale again enlisted Phelps's aid. Phelps was able to provide Ms. Dale the loan modification fee as well as the first month's payment under the modified loan by pooling resources with another social service organization, the United Services Community Action Agency ("USCAA").

Despite the assistance Ms. Dale received from Phelps, HIC, and USCAA in making the initial payments under the modified loan, Ms. Dale failed to return an unaltered loan modification agreement to HomEq.[7] Consequently, when Dale sent in her March payment (along with a voided check to initiate direct withdrawal of future payments) on the modified loan, HomEq returned her checks and notified her that HomEq could not accept her checks because she was in bankruptcy and the checks were insufficient to reinstate the mortgage. Ms. Dale was not in bankruptcy at the time and she once again sought the assistance of Phelps to remedy HomEq's error.

---

[7] The signed loan modification Ms. Dale sent to HomEq sometime in February or March was ineffective because Ms. Dale made several additional notations on the form, thereby indicating that she did not unequivocally accept the terms proposed by HomEq.

5

In response to an inquiry from Phelps on July 3, 2003, HomEq sent Ms. Dale a letter on July 25, 2003, apologizing for its error and explaining that the checks were returned because Ms. Dale's file had not been updated to reflect the modified loan, as a result of Ms. Dale's failure to return a signed, unaltered loan modification agreement. The letter also informed Ms. Dale that another loan modification agreement was being sent by certified mail to her for proper execution. The Defendants maintain that Ms. Dale never returned a properly executed loan modification agreement, and Ms. Dale was unable to produce any evidence or credible testimony that she did.

After Ms. Dale's checks were returned in June 2003, Ms. Dale did not make or attempt to make any other payments under the original or modified loan agreement, and in August 2003, HomEq notified Ms. Dale that her loan was in foreclosure status. Ms. Dale testified that around this time, an employee in HomEq's "Loss Mitigation Department," Betty Veasy, represented to Ms. Dale that HomEq would hold off on foreclosure and that Ms. Dale could have a temporary forbearance on her loan. However, Ms. Dale was unable to produce any written evidence substantiating this claim, nor did she ever make this allegation before the January 7 hearing.

Confronted with yet another foreclosure proceeding, Ms. Dale filed her third chapter 13 bankruptcy on January 9, 2004. This adversary proceeding followed.

## IV. DISCUSSION

Despite the litany of allegations Ms. Dale leveled against the Defendants, she failed to prove a single instance of any actionable conduct. In fact, the evidence adduced by Ms. Dale shows that HomEq did not violate the law in any way; to the contrary, it shows that HomEq treated Ms. Dale fairly and equitably.

In November 1998, Ms. Dale obtained a loan in the principal amount of $34,083.00. Since that time, Ms. Dale has dragged HomEq through four bankruptcies, making only a handful of payments on her loan. On November 11, 2001, in her second chapter 13 bankruptcy, Ms. Dale, who was represented by counsel at that time, stipulated that the total debt to HomEq, exclusive of attorneys' fees, had reached $41,431.48.[8] Then, just over a year later after making few, if any, payments on the loan, Ms. Dale,

---

[8] In light of Ms. Dale's November 2001 stipulation, her repeated protestations that HomEq charged her unreasonable fees ring hollow and appear to be little more than a delay tactic.

6

through P.J. Phelps, asked HomEq to stop foreclosure and help her keep her home. In spite of the long history of default on Ms. Dale's loan, HomEq responded quickly and generously to her request, offering her a modified loan for $42,194.85 – only $763.37 more than the amount to which Ms. Dale had stipulated in November 2001 and with a lower interest rate. Based on the Court's thumbnail calculations, at 9.75% the loan had been accruing interest at a rate of approximately $3,323.00 per year, so HomEq's offer to modify her loan not only constituted a waiver of over $11,000.00 in legal fees (which sum would not have been unreasonable considering the work created by Ms. Dale's three prior bankruptcies), but appears to have also waived a portion of the accrued interest to which HomEq was contractually entitled.[9] Ms. Dale, however, failed to avail herself of HomEq's generous offer.

The basis for many of Ms. Dale's claims is that HomEq failed to provide responses to her requests for information and that she never received an itemized accounting of the amounts due on her loan. But Ms. Dale failed to specify even one instance where she made a specific request which HomEq or the other defendants did not answer. The only "requests" to which Ms. Dale may not have received a response were general assertions by her that she was being charged unwarranted fees or that the amount due was not accurate. Because these were not specific requests, and, more importantly, because Ms. Dale had, in fact, received at least one itemized statement of her account from HomEq on December 9, 2002 (not to mention Ms. Dale's November 2001 stipulation with TMS effectively eliminating any basis for challenging the amount due under $41,431.48), the Court finds no merit in these allegations.

Turning to the merits of each count of Dale's complaint, the discussion and analysis below may appear somewhat terse, but the paucity of evidence adduced by Ms. Dale obviates the need to engage in lengthy explanations of her failure of proof. In other words, it's hard to say much about nothing.

---

[9] Based on Ms. Dale's obvious intelligence as displayed in these proceedings, Ms. Dale should have appreciated that the amount owed on a $34,000.00 loan taken out in November 1998 at 9.75% interest would increase by approximately $3,300.00 a year if she didn't make payments, and that by December of 2002, she would owe, at the very least, $43,900.00, exclusive of any charges, late fees, or force placed insurance premiums.

7

**A.    Civil Conspiracy**

To state a cause of action for civil conspiracy, a plaintiff must allege and prove that the defendants conspired and agreed to commit an unlawful act and, in fact, committed that unlawful act which resulted in damages to plaintiff.[10]

Ms. Dale failed to prove that any of the Defendants conspired to commit an unlawful act, that they committed an unlawful act, or that she suffered any damages as a result of the Defendants' conduct. Further, because the Defendants all shared an agent/principal relationship, a conspiracy of individuals was, most likely, impossible under the circumstances.[11]

**B.    Negligence**

To prevail on a cause of action for the tort of negligence, a plaintiff must prove that the Defendants owed her a duty, that they breached that duty, and that the breach of that duty proximately caused her damage.[12] A breach of contract will not provide a basis for tort liability.[13]

Ms. Dale cannot prevail on a claim for negligence because she did not establish that any of the defendants owed her a duty cognizable under the law. Although not a tort, she also failed to show that they breached a contact with her.

**C.    Reckless or Negligent Misrepresentation of Material Facts**

To prevail on a claim for negligent misrepresentation, a plaintiff must prove that (1) a speaker supplied information in the course of his or her business, (2) because of a failure by the speaker to exercise reasonable care, the information was false, (3) the information was intentionally provided by the speaker for the guidance of a limited group of persons in a particular business transaction, (4) the listener justifiably relied on the

---

[10] *See Johnston v. Norrell Health Care, Inc.* 835 S.W.2d 565, 568 (Mo. Ct. App. 1992) (*citing McMullin v. Community Sav. Serv. Corp.*, 762 S.W.2d 462, 465 (Mo. Ct. App. 1998)).

[11] Conspiracy is not possible between an agent and a principal. *Metts v. Clark Oil & Refining Corp.*, 618 S.W.2d 698, 702 (Mo. Ct. App. 1981). "[T]he general rule holds that a corporation cannot conspire with its own employees." *Id.* An exception exists if an employee has an "independent personal stake in achieving the object of the conspiracy." *Id.* That exception has not been proven here.

[12] *Faheen, by and through Hebron v. City Parking Corporation*, 734 S.W.2d 270 (Mo. Ct. App. 1987).

[13] *Haughland v. Parsons*, 863 S.W.2d 609, 611 (Mo. 1992).

8

information, and (5) due to the listener's reliance on the information, the listener suffered a monetary loss.[14]

In general, Ms. Dale's allegations of fraud are too vague or conclusory to support a claim for reckless or negligent misrepresentation. Moreover, the evidence adduced at trial does not support such a claim.[15] Even if Ms. Dale had proven that HomEq made a mistake on a statement of the amount due, that fact alone – without more – would not constitute a claim for reckless or negligent misrepresentation.

**D.     Defamation**

In order to prevail on a claim for defamation, a plaintiff must prove: (1) publication (2) of a defamatory statement (3) which identifies plaintiff (4) that is false, (5) that is published with the requisite degree of fault, and (6) damages plaintiff's reputation.[16]

Ms. Dale asserted that the allegedly incorrect statements of the amount due and the notices of foreclosure were defamatory, but she failed to establish that any of those statements was false. She also failed to show how they were defamatory. Therefore, her claim for defamation must fail.

**E.     Breach of Contract**

To prevail on a breach of contract claim, a plaintiff must prove: (1) the existence of an agreement between parties that are capable of forming a contract; (2) mutual obligations that arise under the contract; (3) valid consideration; (4) part performance by one party and prevention of further performance by the other; and (5) damages measured by the contract and resulting from its breach.[17]

The contracts in the present case are the note and the deed of trust, and the breaches alleged were improper foreclosure and the charging of fees unauthorized by the

---

[14] *See, e.g., Summer Chase Second Edition Subdivision Homeowner's Assn. v. Taylor-Morley, Inc.*, 146 S.W.3d 411 (Mo. Ct. App. 2004).

[15] Claims of fraud must be plead and proven with specificity. Fed. R. Bank. P. 7009; Fed. R. Civ. P. 9; *Schuhardt v. Washington University*, 390 F.3d 563, (8th Cir. 2004).

[16] *Overcast v. Billings Mutual of Insurance Co.*, 11 S.W.3d 62 (Mo. 2000).

[17] *Deichman v. Boeing Co.*, 38 F.Supp.2d 783, 786 (Mo. Ct. App. 1998).

contract. But Ms. Dale failed to prove either that the attempted foreclosures were improper or that the fees charged were not authorized by the contract. Clearly, she was substantially in default each time a foreclosure proceeding was commenced. Moreover, she has failed to prove that she suffered any damages as a result of the alleged breaches. She has already been discharged of her personal liability under the note, and she did not offer any evidence to show that she has any equity in her residence above and beyond the uncontested amount she owes HomEq.

**F.      Fraud**

To prevail on a claim for fraud, a plaintiff must prove that the defendant (1) made a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or his ignorance of its truth, (5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated, (6) the hearer's ignorance of the falsity of the representation, (7) the hearer's reliance on the representation being true, (8) the right to rely thereon, and (9) the hearer's consequent and proximately caused injury.[18] A fraud claimant must establish every element to prevail.[19]

Although Ms. Dale may have established that one or more of the defendants made representations to her,[20] *e.g.*, the amount due on her loan, she did not prove the falsity of any of these representations, let alone any of the other elements necessary to establish fraud.

**G.      Intentional Infliction of Emotional Distress**

To prevail on a claim for intentional infliction of emotional distress, a plaintiff must prove that the defendant's behavior was extreme and outrageous, that the defendant acted in an intentional or reckless manner and that the defendant's conduct resulted in

---

[18] *Evergreen Natl. Corp v. Carr*, 2004 WL 615026 (Mo. Ct. App. 2004).

[19] *See Reis v. Peabody Coal Co.*, 997 S.W.2d 49, 59 (Mo. Ct. App. 1999).

[20] At trial, Ms. Dale alleged for the first time that Betty Veasy fraudulently represented to her that HomEq would suspend its foreclosure efforts and grant her a forbearance on her loan. Because Ms. Dale failed to plead this allegation of fraud in her complaint (which allegation would have had to have been pled with particularity), the allegation will be disregarded. *See* Fed. R. Bank. P. 7009; Fed. R. Civ. P. 9; *Schuhardt v. Washington University*, 390 F.3d 563, (8th Cir. 2004). However, the Court notes that even if properly pled, Ms. Dale did not provide credible evidence that Ms. Veasy made any fraudulent representations.

10

severe emotional distress.[21]  "The conduct alleged must be so outrageous as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society."[22]  Further, the distress must be medically significant and diagnosable.[23]

Ms. Dale failed to prove that any of the Defendants committed a reckless act, or that she incurred a medically significant and diagnosable condition, so her claim for intentional infliction of emotional distress must fail.

**H.    Unjust Enrichment**

Unjust enrichment occurs when a benefit is conferred upon a person in circumstances in which the retention of the benefit, without paying its reasonable value, would be unjust.[24]  The elements for unjust enrichment are: (1) one party conferred a benefit on another, (2) the receiving party acknowledged or recognized that a benefit was conferred, and (3) the receiving party accepted and retained the benefit.[25]

Ms. Dale failed to establish that any of the Defendants has received a benefit, let alone retained a benefit unjustly.  Unless Ms. Dale's residence brings more at foreclosure than the principal balance of the loan, the defendants will never receive a benefit from this transaction.  If anything, Ms. Dale is the one has been unjustly enriched by her failure to make mortgage payments while retaining and occupying her home.  Therefore, Ms. Dale is not entitled to relief on her claim of unjust enrichment.

**I.    Tortious Interference with Contractual Relations**

To prevail on a claim for tortious interference with contractual relations, a plaintiff must prove (1) the existence of a contract or valid business expectation; (2) a defendant's knowledge of the contract; (3) his intentional interference by the defendant

---

[21] *Dunham v. City of O'Fallon*, 945 F.Supp. 1256 (Mo. Ct. App. 1996).

[22] *Id.*

[23] *Id.*

[24] *S&J, Inc. v. McLoud & Co., L.L.C.*, 108 S.W.3d 765, 768 (Mo. Ct. App. 2003).

[25] *Id.*

11

inducing or causing a breach of the contract; (4) an absence of justification; and (5) damages.[26]

Ms. Dale cannot prevail on an action for tortious interference with contractual relations because the Court was unable to discern – from the complaint or the evidence adduced at trial – what facts alleged, even if proven true, might support a claim for tortious interference with contractual relations.

### J.     Racketeer Influenced and Corrupt Organizations (RICO) Claims

To establish civil liability under the RICO statute, a plaintiff must prove that the defendants engaged in a "pattern of racketeering activity." 18 U.S.C. § 1962. A pattern of activity requires the commission of at least two acts of racketeering. § 1961(5). Vague, conclusory allegations of a conspiracy to commit fraud are not sufficient for relief under the RICO statute.[27]

All of Ms. Dale's RICO allegations were broad and conclusory. Moreover, Ms. Dale failed to prove that any of the Defendants committed a predicate act necessary to impose RICO liability or that she incurred any damages as a result of such an act. 18 U.S.C. § 1961(1) (listing predicate acts).

### K.     Fair Debt Collection Practices Act (FDCPA) Violations

Ms. Dale alluded to four sections of the FDCPA but failed to establish a claim under any of them.

1. 15 U.S.C. § 1692e(2) provides that a creditor must not misrepresent the status of a loan. In order to prevail under the FDCPA, Ms. Dale needed to establish a representation, its falsity, and her damages caused thereby. Ms. Dale failed to establish that any of the Defendants made a false representation. Therefore, she is not entitled to relief under § 1692e(2).

2. Section 1692f(1) prohibits creditors from collecting any fees or charges not authorized by contract. To prevail under this provision, Ms. Dale needed to establish that she was charged fees or charges that were not authorized by contract. Ms. Dale failed to do this, and, therefore, she is not entitled to relief under § 1692f(1).

---

[26] *See Deutsche Financial Services Corp. v. BCS Ins. Co.*, 299 F.3d 692 (8th Cir. 2002).

[27] *See Trautz v. Weisman*, 819 F.Supp. 282 (S.D. N.Y. 1992).

      3.      Section 1638(a)(6) requires lenders to make certain disclosures before the extension of credit. Because the loan, *i.e.*, extension of credit, to Ms. Dale was made prior to November 6, 2000, this claim is barred by *res judicata*. The change in servicer from TMS to Fairbanks/HomEq does not constitute a new extension of credit, and, therefore, does not get Ms. Dale over this hurdle. Accordingly, Ms. Dale is not entitled to relief under § 1638(a)(6).

      4.      Section 1638(a)(5) requires a lender to disclose the "total of payments" before the extension of credit. This claim will be denied for the same reason Ms. Dale is not entitled to relief under § 1638(a)(6), discussed immediately above.

**L.     Real Estate Protection Act (RESPA) Violations**

In order to prove that HomEq's failure to respond to her inquiries gives rise to a cause of action under RESPA, a plaintiff must prove, *inter alia*, that she made an inquiry covered by the statute and that the servicer's response was inadequate. 12 U.S.C. § 2605(e)(2).

Ms. Dale failed to establish that any of the Defendants violated RESPA, inasmuch as she never identified a specific inquiry that was unanswered and never proved that any information provided to her by the defendants was incorrect.

**M.     Fair Credit Reporting Act (FCRA) Violations**

Ms. Dale contends that HomEq failed to correct her credit report. 15 U.S.C. § 1681, *et seq.*, requires a consumer-reporting agency to reinvestigate a consumer's file if the consumer disputes its completeness or accuracy. 15 U.S.C. § 1681e requires that a creditor verify and correct, if necessary, alleged errors in a credit report.

Ms. Dale is not entitled to relief under the FCRA because she lacks standing to bring an action under the FCRA – only specified federal and state agencies are allowed to bring enforcement actions. 15 U.S.C. § 1681s-2(d). Moreover, Ms. Dale did not prove that there were any errors in her credit report or that a Defendant caused or failed to correct such an error.

13

### N. Truth in Lending Act Violations

TILA provides that a lender is obligated to disclose certain information before extending credit.[28] Because, as discussed above, there was no new extension of credit during the time frame considered in this proceeding, *i.e.*, from November 6, 2000, to the present, Ms. Dale cannot sustain a claim under TILA. Moreover, the Court was unable to discern from the complaint or the evidence adduced at trial what conduct might have been implicated by the statute.

### O. Federal Trade Commission Act (FTCA) Violations

The FTCA provides no private cause of action for violations.[29] Therefore, Ms. Dale is not entitled to relief for any violation of FTCA, regardless of whether one was committed.

### V. CONCLUSION

All of Ms. Dale's claims must be denied because she has failed to prove a factual or legal basis for relief on any of the claims asserted. At most, Ms. Dale may have proved that HomEq made one mistake – stating in a letter that she was in bankruptcy when she was not – but HomEq quickly remedied that mistake (which, at root, was caused by Ms. Dale's actions) and Ms. Dale suffered absolutely no harm because of it. Accordingly, the Court will grant the Defendants' motions for judgment on all counts of Ms. Dale's second amended complaint.[30]

As a final note, the Court commends Ms. Dale for the intelligent and professional manner in which she conducted herself during these proceedings. Although not every pleading was properly filed, captioned, or argued, overall Ms. Dale did a very fine job of representing her own interests. But this commendation is not an endorsement of her decision to bring this lawsuit. For in the end, Ms. Dale's allegations proved baseless and frivolous and wasted the time and resources of the defendants.

---

[28] 15 U.S.C. § 45, *et seq.*

[29] *Brown Shoe Co., Inc. v. Federal Trade Commission*, 399 F.2d 45, 51 (8th Cir. 1964) *rev'd on other grounds by* 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587.

[30] Although the issue is not before the Court at this juncture, Ms. Dale should be forewarned that the Court will not allow her to improperly use the bankruptcy process to forestall HomEq's future attempts to foreclose its interest in her residence.

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order will be entered pursuant to Fed. R. Bankr. P. 9021.

**ENTERED** this 17th day of March 2005.

/s/ Jerry W. Venters
HONORABLE JERRY W. VENTERS
UNITED STATES BANKRUPTCY JUDGE

A copy of the foregoing was mailed
conventionally or electronically to:
Virginia P. Dale
Kevin M. Bright
Wesley T. Kozeny
Kasey A. Rogg
Jill D. Olsen
James C. Morrow